IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PETER MEKOSH, et al.          :     CIVIL ACTION
                              :
        v.                    :
                              :
HILLTOWN TOWNSHIP             :
MUNICIPALITY, et al.          :     NO. 07-4260

MEMORANDUM

McLaughlin, J.                                      May 26, 2009

        This case arises out of the arrest of plaintiffs Peter
Pollock and Peter Mekosh at the residence of Peter Pollock's
wife, Marjorie Pollock, with whom he was having a contentious
divorce.  The plaintiffs bring a civil rights action against
Marjorie Pollock, Hilltown Township Municipality, Hilltown
Township Police Department, and Officer Louis Bell.  They allege
that the defendants conspired to deprive them of a variety of
their constitutional rights in violation of 42 U.S.C. § 1983.
They also bring three state law claims.

        Marjorie Pollock moved to dismiss the § 1983 claims
against her on the ground that she was not a state actor.  The
Court denied the motion, finding that the plaintiffs had pled
more than merely conclusory allegations of concerted action
between her and Officer Louis Bell.  Central to the Court's
conclusion were the allegations in the complaint that Marjorie
Pollock was having an affair with Officer Bell and that they

conspired together to have the plaintiffs arrested and to bring criminal proceedings against them.

The allegation of an affair turned out to be incorrect. Not only had Marjorie Pollock and Officer Bell not had an affair, they had never met before the day of the incident that was the subject of the lawsuit.  The plaintiffs and the defendants agreed to the dismissal of the case with prejudice, with the understanding that the defendants could file a motion for attorneys' fees and costs pursuant to 42 U.S.C. § 1988.  The defendants did so and the Court here decides that motion.

I.   <u>Legal Standard for an Award of Attorneys' Fees</u>

Section 1988 of Title 42 provides, in pertinent part, that "[i]n any action or proceeding to enforce a provision of [§ 1983], the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."  § 1988(b).  A court can award attorneys' fees to a prevailing defendant under § 1988 only "'upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith.'"  <u>Commw. v. Flaherty</u>, 40 F.3d 57, 60-61 (3d Cir. 1994) (quoting <u>Christiansburg Garment Co. v. EEOC</u>, 432 U.S. 412, 420 (1972)).  A finding of bad faith, although not required for an award of attorneys' fees, weighs strongly in favor of such an

award.  Christiansburg, 434 U.S. at 422; see also Barnes Foundation v. Township of Upper Merion, 242 F.3d 151, 165-66 (3d Cir. 2001).

To decide the motion, the Court must determine if the plaintiffs or their counsel had an adequate basis to allege that Marjorie Pollock and Officer Bell were having an affair, and if they did not, whether that allegation was sufficiently "groundless" or "without foundation" to allow an award of fees. Although not required for an award of fees, the Court must also consider whether the plaintiffs or the plaintiffs' counsel acted in "bad faith," by knowingly or recklessly making a false allegation of the affair.

The Court answers these questions affirmatively as to the plaintiffs, finding that their allegation of an affair was groundless and that it was made in bad faith.  Although the Court has concerns about the way counsel for the plaintiffs handled this litigation, the Court finds the conduct of counsel was not sanctionable.[1]

---

[1]   Section 1988 does not itself authorize attorneys' fees to be taxed to the plaintiff's counsel.  Brown v. Borough of Chambersburg, 903 F.2d 274, 277 (3d Cir. 1990) (holding that § 1988 does not authorize the award of attorneys' fees against a plaintiff's attorney).  The Court could nonetheless apportion some or all of an award of attorneys' fees to plaintiff's counsel through Fed. R. Civ. P. 11 or the Court's inherent powers.  See Quiroga v. Hasbro, Inc., 934 F.2d 497, 504 (3d Cir. 1991) (remanding an award of attorneys' fees to the prevailing defendant to allow the district court to consider whether they should be taxed, in whole or in part, to plaintiff's counsel).

I.   Discovery Concerning The Plaintiffs' Allegation of an Affair
     Between Marjorie Pollock and Officer Louis Bell

     The plaintiffs' complaint alleges that "[u]pon information and belief, Defendant [Marjorie] Pollock was having an extramarital affair with a police officer in the Hilltown police department" and that "[u]pon information and belief, said police officer was Defendant [Louis] Bell."  Compl. ¶¶ 13-14.

     The plaintiffs have said that they relied on the following facts as the basis for their allegation of an affair between Marjorie Pollock and Officer Louis Bell: (1) that the plaintiffs had been told by Bonnie Swann, an acquaintance of theirs who knew Marjorie Pollock, that Swann had been told by Marjorie Pollock that Pollock was having an affair with Officer Bell; (2) that sometime before the filing of the complaint, Marjorie Pollock had told her husband, Peter Pollock, on three separate occasions, that she met a police officer who asked her out to lunch; (3) that during the incident that resulted in the plaintiffs' arrest, Officer Bell referred to Marjorie Pollock as "Marjorie;" and (4) that sometime during the incident Officer Bell appeared to be having an intimate conversation with Marjorie Pollock.

     Of these supporting facts, the most important is Bonnie Swann's statement to the plaintiffs that Marjorie Pollock had told her of the affair.  Absent her statement, the other supporting facts taken together would not have given a reasonable

4

basis to allege the existence of an extramarital affair between Marjorie Pollock and Officer Bell.

Counsel for the plaintiffs did not attempt to verify Bonnie Swan's alleged statement to the plaintiffs until after the complaint was filed.  Defendants Marjorie Pollock and Officer Bell denied the existence of any affair in their answer, and the parties agreed to a short discovery schedule.  All parties indicated a desire to depose Bonnie Swann.

A.   Attempts to Depose Bonnie Swann

Counsel for both the plaintiffs and the defendants spoke to Swann separately in attempting to arrange her deposition.  Counsel for the plaintiffs spoke to Swann in February 2008.  In that conversation, the plaintiff's counsel says Swann confirmed that Marjorie Pollock had told Swann that Marjorie Pollock was having an affair with Officer Bell and said that she would be willing to sign an affidavit to that effect.[2] Counsel for Marjorie Pollock interviewed Swann two times in March 2008.  Defense counsel says that in those conversations Swann

---

[2]     Letter to Court from Attorney Ari Karpf of April 9, 2008; Aff. of Ari Karpf, Ex. D to Pl. Opp. Br.; Tr. of April 10, 2008, Hearing at 7-8.

denied making the statements that the plaintiffs' attribute to her.[3]

Counsel for the defendants subpoenaed Swann for deposition on April 3, 2008, but she refused to appear, either in person or by telephone, saying she was traveling out of state. On April 10, 2008, the plaintiffs' counsel wrote the Court, stating that plaintiff Peter Pollock had received a voicemail message from Swann complaining of intimidation.  The Court held a conference with counsel, at which a recording of Swann's message was played.  Although not clearly audible, in the message, Swann was complaining of what she perceived to be intimidation by plaintiff Peter Pollock's brother Seth.  The Court expressed grave concern at any suggestion that a witness was being intimidated or otherwise induced to say something untrue, and warned that the truth of Swann's seemingly directly contradictory statements to defendants' and plaintiffs' counsels would be resolved by her deposition.

Plaintiffs' counsel stated that he would subpoena Swann for deposition.  He did so and her deposition was scheduled for April 28, 2009.  Swann contacted the plaintiffs' counsel on the day of her deposition to say she could not appear and to reschedule for the following day.  On April 29, 2009, Swann again

---

[3]    Letter to Court from Attorney Stuart Wilder of April 9, 2008; Tr. of April 10, 2008, Hearing at 7.

called plaintiff's counsel to cancel her deposition.  That evening, a lawyer from the plaintiff's counsel's office went to Swann's home, where she signed an affidavit prepared by the plaintiff's counsel.

B.   <u>Bonnie Swann's Affidavit</u>

The affidavit of Bonnie Swann, dated April 29, 2009, and provided to defendants' counsel the next day, states:

1.   My name is Bonnie Swann, and I am an adult individual.

2.   I know Marjorie Poll[o]ck and Peter Poll[o]ck.

3.   I am in the business of providing nursing-related services.

4.   While at one of my client's sites, I worked with Marjorie Poll[o]ck on several occasions.

5.   A few years ago, during the course of several conversations, Marjorie Poll[o]ck explained that she [was dating] Officer Louis Bell.

6.   I understood from my conversations with Marjorie Poll[o]ck that she was having a romantic and/or sexual relationship with Officer Louis Bell of the Hilltown Township Police Department.

Paragraph five of the affidavit signed by Swann contains a handwritten change to the version prepared by the plaintiff's counsel.  The plaintiff's counsel's original, type-written version of paragraph five stated that " . . . Marjorie

Pollock explained that she was having an affair with Officer Louis Bell."  Swann crossed out "having an affair with" and substituted "dating."  Neither the original nor the signed affidavit said that Bonnie Swann had told the plaintiffs about her conversations with Marjorie Pollock before the filing of the complaint.

      C.   <u>Bonnie Swann's Deposition</u>

      At the request of the defendants' counsel the Court held a telephone status conference with the parties on May 2, 2009, to discuss Swann's failure to appear at deposition.  The Court noted that, given the circumstances of its preparation, Swann's affidavit would likely not be useable for any purpose in these proceedings and that Swann would have to be deposed, as had been previously discussed.  Counsel for the defendants indicated that they would file a motion to enforce their subpoena of Swann. The Court ordered all parties and their counsel to have no further substantive conversations with Swann before her deposition and said it would await the defendants' motion.  The defendants' motion to enforce their subpoena was filed May 2, 2009, granted May 6, 2009, and Swann appeared for deposition on May 15, 2009.

At her deposition, Bonnie Swann denied that Marjorie Pollock ever told her that she (Marjorie Pollock) was having an affair with Officer Bell:

Q    Did Marjorie Pollock ever tell you that she was romantically involved with Officer Louis Bell?

.........................................

A    Okay.  No. When Marjorie and I spoke, and it was at Mary DeNardo's house, we all talked about going out for a drink and having some fun and dating came up. She never mentioned Officer Bell's name.

.........................................

Q    Well what about dating came up during the conversation?

A    That she was having a hard time at home with her marriage and she really couldn't take any more of what was going on, whatever that was, and she wanted to go out and have a good time.

Q    Okay.  During that conversation, did she tell you, specifically, that she was dating Officer Louis Bell of the Hilltown Police Department?

A:   No.

Q    Did she tell you that she was dating any police officer?

A:   No.

Q    At any time, other than during that conversation, did Mrs. Pollock tell you that she was dating Officer Louis Bell?

A:   No.

> Q      Okay, did she ever tell you that she was
>        dating a police officer at any time?
>
> A:     No.

5/15/09 Dep. of Bonnie Swann at 18-19.  Later in her deposition,

in discussing her affidavit, Swann reaffirmed that she was not

told and did not know whether Marjorie Pollock and Officer Bell

were having a relationship:

> A      . . . Marjorie and I and another person
>        talked about going out, she was
>        divorcing, I'm divorcing, and we just
>        wanted to go out and have fun, whether
>        it was to have a couple of drinks, to,
>        maybe, you know, date, or start our
>        lives over, whatever, but I didn't --
>        and it's my fault probably because I
>        didn't read all of [the affidavit]
>        correctly, but I know she wasn't having
>        an affair, to my knowledge.

Swann Dep. at 46.

Swann also denied ever telling the plaintiffs that

Marjorie Pollock had told her that she (Marjorie Pollock) was

having an affair with Officer Bell:

> Q      Did you ever tell Peter Pollock that
>        Marjorie Pollock had confided in you
>        that she was seeing a police officer by
>        the name of Louis Bell?
>
> A      Peter Pollock and I and his father and
>        another gentleman got in a conversation
>        at Mr. Pollock's -- Earl Pollock's home,
>        and they were both really mad that day,
>        something to do with the police officer
>        going to Marjorie's home alone and
>        arresting -- and I thought that they
>        said he and his father -- arrested he
>        and his father, and wasn't it odd that
>        Peter Bell [sic] -- not Peter -- officer

> Louis Bell was there alone and not with
> another officer, because usually, police
> officers come in two and not by
> themselves.
>
> ...........................................
>
> Q    Did you say anything to, either, Mr.
>      Pollock or the other gentleman in
>      response to those comments?
>
> A    Just that I had heard about Officer
>      Bell, and I think if you live in
>      Hilltown, you hear about Officer Bell.
>      Some of his arrests, or, you know, kids,
>      or whoever.  I mean, I've heard the name
>      before.  I've never met the man.
>
> Q    But if I understand your testimony,
>      during that conversation, you did not
>      tell Mr. Pollock or the other gentleman
>      that Marjorie Pollock was dating or
>      romantically involved with Officer Louis
>      Bell?
>
> A    No.  And I -- I have searched my sole
>      [sic] for this, and I know that
>      [plaintiff's counsel] Mr. Karpf has
>      called me, and I think the world of
>      Peter, he's never done me wrong or
>      proven himself bad to me in any way, but
>      I -- I -- he -- no.  No. They were not
>      romantically involved, that I know of.
>      I mean I --

Swann Dep. at 19-20.

Swann conceded that she had signed the affidavit
presented to her by counsel for the plaintiffs, but that she did
this because she felt pressure to do so from plaintiff Peter
Pollock and the plaintiffs' counsel.  She testified that the
plaintiffs' counsel had called her in late February or March 2008
and asked her whether Marjorie Pollock and Officer Bell were

11

having an affair.  Swann testified that she falsely said that
they were having an affair.  She said she did so because the
plaintiffs' counsel asked her "leading" questions and because she
was answering his questions while driving home from a difficult
family matter and was distracted:

> A     . . . he asked me the same questions
> that you're asking me today.  And if I
> remember then what I -- I said I like
> Peter and I would do anything for him,
> and he said -- then he went on to say
> something about Marjorie and whether she
> had an affair.  He used the word an
> affair with Officer Bell, and I -- I
> believe then I said, yes I -- Marjorie
> did tell me that, but that wasn't the
> case.
>
> Q     Okay.  Why did you tell him that if it
> wasn't the case?
>
> A     I think it was the way he was leading me
> into the questions and asking the
> questions to me.  And then I thought
> about it over the past few months, I've
> tried desperately hard to think of the
> last time I saw Marjorie, what Marjorie
> and I talked about, what Peter and I
> talked about.  Peter called me several
> times and wanted to have lunch and meet
> with me and Mar — no, Marjorie did not
> have -- not that I know of, anyway, have
> an affair with Officer Bell.
>
> Q     Now, you said it was something about the
> way he was asking you the questions?
>
> A     It was.  I was driving, actually.  I was
> in my car, I was just coming home from
> doing some legal work for my parents who
> just passed away, and I told him I was
> in the car, I believe, and I told him,
> could he call me back.  And he said
> something about sending a letter and

12

                         just signing it, and I said that would
                         be fine, too.  But that -- that was it.

              Q    Okay.  Did [plaintiffs' counsel]
                   threaten you?

              ...........................................

              A:   No.

              Q    Did he offer you any inducements to say
                   that you had been told there was an
                   affair?

              A:   No.

Swann Dep. at 21-22.  Swann later described the plaintiffs'

counsel as "asking the same question but in different ways,"

which caused her to become very confused.  Id. at 41-42.  Swann

also stated, however, that the plaintiffs' counsel also told her

that he wanted her to tell the truth and that he never asked her

to lie.  Id. at 41, 55.

        Swann testified that plaintiff Peter Pollock called

her four times to discuss this lawsuit.  In the first call, Peter

Pollock asked Swann to lunch, but she declined.  He called at

least three more times.  Swann testified that she never told

Peter Pollock in any of those phone calls that Marjorie Pollock

had told her of an affair with Officer Bell.  She testified that

after the last phone call, she left a voicemail recording, later

played for the Court and discussed earlier, in which she

complained of being harassed.  Swann summarized her voicemail as

saying, "I do not want to get involved, that I didn't trust his

father and I didn't trust his other brother, and I just don't want to be involved."  Swann said her worry was that Peter Pollock's father and brother could affect her job.  She testified, however, that she never spoke to either Pollock's father or brother about her testimony and that neither they nor anyone else had threatened her in connection with her testimony. Swann Dep. at 23-23.

        D.    <u>The Plaintiffs' Voluntary Dismissal of Their Complaint</u>

After Swann had given her deposition, the plaintiffs agreed to voluntarily withdraw their complaint.  The parties signed a stipulation of dismissal with prejudice (Docket No. 38) that expressly preserved the defendants' right to file a state law civil suit for wrongful use of civil proceedings and stated that the stipulation would be considered a termination in favor of the defendants with respect to such an action.  The parties also understood that the dismissal allowed the defendants to move for an award of attorneys' fees.  After entry of judgment against the plaintiffs, both Marjorie Pollock and Officer Bell moved for attorneys' fees before this Court as prevailing parties under 42 U.S.C. § 1988.

II.   The Evidentiary Hearing Concerning the Defendants' Motion
      for Attorneys' Fees

          The Court held an evidentiary hearing on the

defendants' motions for attorneys' fees on October 21, 2008.  The

Court heard testimony from the two plaintiffs, Peter Pollock and

Peter Mekosh, and the two individual defendants, Marjorie Pollock

and Officer Louis Bell, but did not hear testimony from Bonnie

Swann.  Bonnie Swann was subpoenaed for the hearing by the

plaintiffs' counsel but did not appear.  Counsel for the

defendants were not able to serve her with a subpoena.  Neither

side asked the Court to issue a bench warrant for Swann.


      A   Testimony by Defendants Marjorie Pollock and Officer
          Louis Bell

          Both Marjorie Pollock and Louis Bell testified that

they had never had an affair or a romantic relationship with each

other.  Officer Bell testified that he had never met Marjorie

Pollock until he was called to the Pollock residence on the night

of the incident.  Marjorie Pollock testified that she had never

met Officer Bell except for the two or three times he had come to

the Pollock residence to respond to domestic disputes.  10/21/08

Tr. at 14, 103.

          Marjorie Pollock testified that, before the complaint

in this matter was filed, she had seen Bonnie Swann only three or

four times, through their work.  Swann worked as a care giver for

hospice patients and Pollock worked for Doylestown Hospital as a hospice nurse, and they would run into each other while caring for patients.  Marjorie Pollock testified she never told Bonnie Swann that she was having "any type of relationship" with Officer Louis Bell.  10/21/08 Tr. at 7, 14-15.

Marjorie Pollock was not questioned, and did not testify, about the events that lead up to the plaintiffs' arrest. Officer Bell was questioned about the circumstances of the arrest.  He testified that he was dispatched to the Pollock residence by the Bucks County Emergency Communications Office. Officer Bell testified that, before he was dispatched, he had received a departmental warning that there was a "potential officer safety issue" at the residence.  The departmental bulletin board had notified officers that Marjorie Pollock had called the police to say she was beginning divorce proceedings and that her husband had warned her not to call the police, and that, if she did, her husband had threatened to "go out in a blaze of glory."  10/21/08 Tr. at 103-05, 114.

Upon arriving at the house, Officer Bell testified that he saw Peter Pollock and Peter Mekosh coming down the front steps and walking toward a white pick up truck.  Officer Bell warned the plaintiffs to stay away from the truck, but Peter Pollock reached inside and retrieved a silver object.  Officer Bell drew his gun.  Officer Bell holstered his weapon after Peter Pollock

showed him that the object was a video camera.  Officer Bell then went inside the house, telling Peter Pollock and Peter Mekosh to wait outside.  Within two minutes, Peter Pollock entered the house and went to his home office.  Officer Bell again told him to leave.  Peter Pollock objected, telling the officer he was trespassing and they had what Officer Bell describes as a "verbal altercation."  10/21/08 Tr. at 104-05.

      Officer Bell testified that Peter Mekosh had also entered the house and was pointing the videocamera at Officer Bell.  Officer Bell then took Mekosh into custody, confirmed that the camera was on and was recording, and placed Mekosh under arrest.  Officer Bell testified that he put Mekosh in his police car, at which point Mekosh said that he was only doing what "his boss" told him to do.  Officer Bell ultimately did not arrest either Peter Pollock or Peter Mekosh at that time.  After consulting with the Bucks County District Attorney's office, Officer Bell later filed an affidavit of probable cause and arrested both Pollock and Mekosh for violations of state wiretapping laws.  The District Attorney's office later dropped all charges against both Mekosh and Pollock at the preliminary hearing.  10/21/08 Tr. at 105-09.

B.     Testimony by Plaintiffs Peter Pollock and Peter Mekosh

Plaintiffs Peter Pollock and Peter Mekosh also testified at the hearing.  Both plaintiffs testified that they had no basis for alleging that Officer Bell and Marjorie Pollock were having an affair, other than what they said they were told by Bonnie Swann.  10/21/09 Tr. at 25-26, 77-78.  Both plaintiffs testified that they were both present, in the kitchen of Peter Pollock's father's house, when Bonnie Swann told them that Marjorie Pollock had told her about the affair.  10/21/09 Tr. at 27-29, 78-79.  The plaintiffs' testimony about this conversation, however, was vague and contradictory, as was the plaintiffs' testimony about the circumstances of their arrest.

1     Vague and Contradictory Testimony Concerning the Plaintiffs' Conversation with Bonnie Swann

Although the allegation of the extramarital affair was critical to the filing of the complaint, and the Court would think a matter of some personal importance to Peter Pollock, neither plaintiff could remember the date, either generally or specifically, of the conversation in which Bonnie Swann allegedly told them of the affair.  Peter Pollock testified the conversation occurred in December or January of 2006.  Peter Mekosh testified the conversation occurred in spring or summer of 2006.  10/21/09 Tr. at 27, 82-83.  Pollock also testified that he had had "one or two" subsequent conversations with Swann over the

18

next few weeks in which she "reconfirmed" what she had told him of the affair.  Pollock conceded he had not mentioned these other conversations in his earlier deposition testimony.  Id. at 27. Pollock did not complain about Officer Bell's conduct to the Hilltown Police Department and only filed this action twenty months after the incident occurred.

Both plaintiffs also differ about the details of the kitchen conversation.  According to Peter Pollock, he, his father, Peter Mekosh, and Bonnie Swann were all present in the kitchen.  Pollock was having a conversation with his father and Peter Mekosh about Pollock's arrest by Officer Bell, which is the subject of this suit.  Swann, who was working as a care-giver to Pollock's father, was standing off to the side.  Pollock testified that Swann, overhearing their conversation, "volunteered" that Marjorie Pollock had told her, three times, that she was having an affair with Officer Bell.  10/21/09 Tr. at 28-29.

According to Peter Mekosh, however, Mekosh was sufficiently disengaged from the conversation that he did not initially hear Swann tell about the affair.  Mekosh testified that, because he was not listening to "every syllable" of the conversation, he missed Swann's initial mention of the affair. He testified that Pollock told him, "you've got to hear this," and made Swann repeat her statement about the affair.  Mekosh

19

testified that Swann at first only said that Marjorie Pollock
said she was having an affair with a police officer, but Peter
Pollock then said to her, "you said it was Louis Bell," and
Bonnie Swann answered, "yes, later on Marjorie told me it was
Louis Bell."  10/21/08 Tr. at 79-82.

> 2    Inconsistent and Contradicted Testimony Concerning
>       the Circumstances of the Plaintiffs' Arrest

In addition to giving contradictory and not credible
testimony concerning their conversation with Bonnie Swann, both
plaintiffs offered non-credible testimony about the circumstances
of their arrest.  The plaintiffs have contended that Officer Bell
repeatedly called Mrs. Pollock by her first name during the
encounter that lead up to the plaintiffs' arrest.  Pollock
testified that Officer Bell said he was in the Pollock house as
"a guest of Marjorie's," which made Pollock "believe that maybe
they knew about each other prior to that incident."  10/21/08 Tr.
at 58, 61.  Mekosh testified that:

> [Officer Bell] started saying 'Well, Marjorie
> said this and Marjorie said that.'  It kind
> of seemed surprising to me that he'd talk
> about -- I mean he could just say your wife,
> he could say you know, Mrs. Pollock.  It just
> really seemed surprising to me that he, you
> know, said it was Marjorie this and Marjorie
> that.

Id. at 95.

20

This testimony, however, was contradicted by the videotape that the plaintiffs made of the incident. Peter Pollock testified that, after Officer Bell arrived, he took a videocamera from his car and gave it to Mekosh who recorded much of the encounter. Mekosh testified that this taping was unintentional and that he did not even know that the camera was recording. 10/21/09 Tr. at 98-99. The Court has viewed that tape, and nowhere on it does Officer Bell say the first name of Marjorie Pollock. He says several times: "Your wife invited me." Ex. B. to Mot. of Def. Hilltown Township.

Another fact offered by plaintiffs to support the allegation that Marjorie Pollock and Officer Bell were having an affair was that Marjorie Pollock did not call 911 to request that the police come to her house, but instead called Officer Bell directly. Peter Pollock testified at the hearing that he and Mekosh had walked outside after Marjorie Pollock threatened to call the police. Pollock testified that, because he wasn't present for her call, he did not know that his wife had called the police and believed that she might not follow through on her threat. 10/21/08 Tr. at 56-57, 67. This testimony was contradicted by the audio recording of Marjorie Pollock's 911 call requesting the police come to the Pollock residence. On the tape, which was played at the hearing, Peter Pollock can be heard in the background, complaining that Marjorie Pollock has said to

21

the dispatcher that he no longer lives at their house.  Peter
Pollock attempted to explain the contradiction by suggesting,
unconvincingly, that he believed his wife was "fak[ing] holding
the phone up to her ear as if she was talking to somebody."
10/21/08 Tr. at 20.

Peter Pollock also testified at the hearing that,
during the altercation, after Pollock had asked Officer Bell to
leave and he had refused, Officer Bell "barged out" of Pollock's
office and "slammed into Peter Mekosh and [Pollock's] son,"
"knocking [his] son into the front wall of the house."  Neither
Pollock nor Mekosh had mentioned that Peter Pollock's son was
present during the incident, much less knocked into a wall, in
either of their depositions, or in their complaint.  Pollock
could not convincingly explain why he had not previously
mentioned his son's involvement in the incident.  10/21/08 Tr. at
59, 65-66.

### 3   The Plaintiffs' Demeanor and Relationship to Each Other

The demeanor of both plaintiffs as witnesses undercut
their credibility.  Peter Pollock gave speeches that were not
responsive to the cross examination.  He appeared angry and
hostile toward Marjorie Pollock.  He called Marjorie Pollock and
her attorney in the divorce action "liars" and said they had
stolen documents from him that would have shown him to have been

current with his child support payments, although he admitted that he had made these same accusations to the divorce court, which had rejected them, and to the appellate court when he appealed the support ruling against him, which also rejected them.  10/21/08 Tr. at 44-45, 47-49.[4]

Peter Mekosh also appeared to be hostile to Marjorie Pollock, at times almost snide.  In describing Bonnie Swann's mention of the affair, he testified that "we were having a discussion regarding what had transpired with [the] Hilltown Township Police, and [she] chimed in with her start[l]ing revelation."  10/21/08 Tr. at 79.[5]

Peter Pollock and Peter Mekosh have a close relationship.  Peter Pollock testified that Mekosh has been his friend for most of his life.  Id. at 33.  At deposition, Mekosh testified Pollock had been his little brother's best friend and so Pollock was "part of my family growing up because he was inseparable from my little brother."  Dep. of Peter Mekosh at 22-23.

---

[4]    The divorce action was begun in December 2005, shortly after the plaintiffs' November 26, 2005, arrest that is the subject of this action.  The plaintiffs filed this suit on October 12, 2007, while Peter Pollock was appealing a July 2007 order of the divorce court, requiring him to pay $3000 month for the support of Marjorie Pollock and their children.

[5]    As discussed earlier, Mekosh subsequently contradicted this description in his hearing testimony and admitted that he had not heard Swann's initial statement.

In 2005, Peter Pollock hired Mekosh to work in his small construction business, even though Mekosh had no construction experience, and was going to teach him the business. Although Mekosh testified that he did not "hang out" with Pollock outside of work, Mekosh frequently attended Peter Pollock's divorce and custody proceedings as "another set of ears."  He was also at the Pollock's house on several occasions when the police were called.  Although Mekosh testified that, from 2005 to 2007, his sole source of income was his employment by Peter Pollock, for whom he worked 40-60 hours a week, he also testified that he cleared a total of only $30,000 over this two year period. 10/21/08 Tr. at 84-88.

IV.  Analysis

The Court has weighed the testimony of the plaintiffs and the individual defendants and the deposition of Bonnie Swann. The Court found both Marjorie Pollock and Officer Louis Bell entirely credible at the hearing.  The Court has no doubt, and so finds, that Pollock and Bell did not have any sort of romantic or personal relationship and that Marjorie Pollock never told Bonnie Swann that she was having any kind of a relationship with Officer Bell.

The Court found the testimony of both Peter Pollock and Peter Mekosh at the evidentiary hearing to be not credible.  With

respect to the circumstances of the plaintiffs' arrest, the
plaintiffs' testimony was inconsistent with that of Officer Louis
Bell.  The Court accepts Officer Bell's version of the facts
entirely and finds not credible any testimony of the plaintiffs
that is inconsistent therewith.  Specifically, the Court rejects
the plaintiffs' testimony that Officer Bell referred to Marjorie
Pollock by her first name; that Marjorie Pollock called Officer
Bell directly rather than calling 911; or that Officer Bell made
physical contact with the Pollocks' son.

        With respect to the plaintiffs' conversation with
Bonnie Swann in which she allegedly told them of the affair
between Marjorie Pollock and Officer Bell, the Court finds the
plaintiffs' testimony to be not credible.  Although Bonnie Swann
did not appear at the evidentiary hearing, the Court feels
comfortable accepting the deposition as her testimony, in view of
the fact that she was cross-examined by everyone during the
deposition.  At her deposition, Bonnie Swann admitted that she
lied to counsel for the plaintiffs and falsely told him that
Marjorie Pollock had told her about an affair with Officer Bell.
Having admitted lying to the plaintiffs' counsel, Swann could
just have easily have admitted that she also lied to the
plaintiffs, but she did not.  Instead, in her deposition
testimony, Swann is clear that she never told the plaintiffs that
Marjorie Pollock told her that she was having an affair with

Officer Bell.  Having weighed the plaintiffs' credibility and found their version of events to be not worthy of belief, the Court finds by a preponderance of the evidence that Bonnie Swann never told the plaintiffs that she had a conversation with Marjorie Pollock in which Pollock told her that she was having an affair with Officer Bell.

In accepting Bonnie Swann's testimony on this point as true, the Court is not excusing her behavior.  Bonnie Swann is obviously someone who lied to counsel for the plaintiffs.  She tried to avoid talking to counsel for any party.  When told that she would not be subpoenaed if she gave an affidavit, she gave a false affidavit.  She did so, however, at least in part, because of pressure placed on her by the plaintiff Peter Pollock, Peter Pollock's family, and the plaintiffs' counsel.  From her voicemail message played to the Court, Bonnie Swann was clearly concerned that Peter Pollock or his family could affect her job.  Swann also felt badgered by both Pollock and the plaintiffs' counsel to give testimony in this matter.  The Court does not excuse her conduct but is very concerned that counsel for the plaintiffs would badger someone to give an affidavit the way counsel for the plaintiffs did in this case.

Based on these factual findings, the Court believes that an award of attorneys' fees to the prevailing defendants is warranted.  The plaintiffs have conceded that the only basis for

26

their allegation of an affair between Officer Louis Bell and Marjorie Pollock was what they alleged they were told by Bonnie Swann.  Having found that Bonnie Swann never told the plaintiffs that Marjorie Pollock had admitted to an affair with Officer Bell, the Court concludes that the plaintiffs had no basis to allege the existence of an affair.  The plaintiffs' allegation is therefore sufficiently "unreasonable" and "without foundation" to justify the award of fees.  See Christiansburg, 432 U.S. at 420.

The Court further finds that the allegation of an affair was made in bad faith and that the plaintiffs made the allegation either knowing it was untrue or with reckless disregard for whether it was true or not.  When the plaintiffs filed this civil rights suit, plaintiff Peter Pollock was in the middle of a contentious divorce from defendant Marjorie Pollock. This gave Peter Pollock a motive to seek to include Marjorie Pollock as a defendant in the suit by fabricating allegations of an affair between her and the police officer who arrested the plaintiffs.  This motive, coupled with what the Court has found to be the lack of any credible evidence of an affair, strongly suggests the plaintiffs made the allegation either knowing it was false or without any concern as to its truth.  This finding of bad faith weighs strongly in favor of an award of attorneys' fees.  Christiansburg, 434 U.S. at 422; Barnes, 242 F.3d at 165-66.

In awarding attorneys' fees against the plaintiffs, the Court will not apportion any responsibility for the award to the plaintiffs' counsel.  The Court does have serious concerns about the conduct of the plaintiffs' counsel in this case.  The Court believes that the plaintiffs' counsel may have badgered witness Bonnie Swann into giving an affidavit that has since been proved false.  The Court also believes that the plaintiffs' counsel did not adequately investigate the existence of an affair between Officer Bell and Marjorie Pollock before making that incendiary allegation in the complaint.  The Court, however, has no basis to believe that the plaintiffs' counsel knew that the allegation of the affair was false, or knew that Bonnie Swann was not telling the truth in her affidavit, until Bonnie Swann recanted her affidavit at her deposition.  The Court believes that the plaintiffs' counsel prepared the complaint on the basis of the plaintiffs' representations, which the Court has found to be both groundless and made in bad faith.  The plaintiffs should therefore be responsible for any award of fees.

The Court will order the plaintiffs to submit a fee petition within fourteen days.

An appropriate Order will be entered separately.